FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| CONTINENTAL INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NO. 98-RRA-2277-S |
| | ) |
| JACK EYER, an individual; | ) |
| JUNKINS-YARBROUGH CORP., | ) |
| a corporation; and JYC&E LIFE | ) |
| & HEALTH AGENCY, INC., a | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

ENTERED

iJUN   8 2000

## MEMORANDUM OPINION

All parties have filed motions for summary judgment. All parties have submitted

briefs. Oral argument has been heard as well. The material facts are not disputed.

Junkins-Yarbrough Corporation (JYC) sold auto, property, casualty, workmen's

compensation, life, and health insurance. The owners of JYC were Junkins, Yarbrough,

and Carter.  JYC&E Life & Health Agency, Inc. (JYC&E), as its name states, sold life

and health insurance policies.   JYC&E was owned by Jack Eyer and the three

principals of JYC. Jack Eyer had an office in JYC's building, and JYC&E made

presentations to JYC's clients and prospective clients. JYC sold "packages" of insurance

to its customers.   Eyer solicited Randy Youngblood, the president of Youngblood

51

Trucking, for his commercial, auto, life, and group health insurance. Eyer sold Youngblood a trucker's policy.[1]

In 1988, there was an accident involving a Youngblood truck and an automobile. An occupant of the automobile, Christine Wiley, was killed. Custard Insurance Adjusters performed a routine investigation of the accident; it interviewed the state trooper who investigated the accident, interviewed the insured and the insured's driver, took witness statements, inspected the accident scene, inspected the vehicles, canvassed the area, took photographs, and spoke with the claimant's attorney. In the ensuing wrongful death action, Wiley's estate obtained a judgment against Youngblood Trucking. When the judgment went unpaid, Youngblood filed an action in state court against, among others, Custard, for damages based on Fiduciary's failure to honor its insurance contract with Youngblood. The state trial court granted Youngblood's motion for summary judgment on the liability issue. Custard then appealed to the Alabama Supreme Court; the court set out the following facts:

> In November 1987, Youngblood Trucking Company ("Youngblood"), by and through its president Randy Youngblood, purchased automobile and truck liability insurance through Jack Eyer, an insurance agent for Junkins-Yarbrough Corporation ("JYC"). The insurer issuing the policy was Fiduciary Indemnity Insurance Group, Ltd. ("Fiduciary"). Eyer applied for the Fiduciary insurance policy through Myrtle Beach Underwriters, Inc., located in South Carolina, and Myrtle Beach was listed as the agent on the policy. The policy period was from November 25, 1987, through November 27, 1988, and the policy provided coverage of $500,000 per accident.

---

[1] Eyer, through JYC&E, sold Youngblood a health insurance policy.

2

When Eyer applied for the policy, he knew that neither Fiduciary nor Myrtle Beach was authorized to transact insurance business in Alabama either as a foreign insurer complying with § 27-3-4 or as a surplus lines carrier.

According to Eyer, he believed that the policy could be written through a licensed surplus lines insurance broker in Alabama. However, neither Eyer, Fiduciary, nor Myrtle Beach attempted to obtain surplus lines insurance coverage through a licensed surplus lines broker. However, Eyer eventually attempted to obtain surplus lines insurance coverage after an accident had occurred involving a Youngblood truck.

Surplus lines insurance coverage is issued when insurance coverage cannot be procured from authorized insurers on terms acceptable to the insureds; in such an event, certain unauthorized insurers may sell insurance to Alabama citizens through a properly licensed surplus lines broker. See § 27-10-20. To become a properly licensed surplus lines broker, a person must be licensed as a resident insurance agent or broker and be deemed by the insurance commissioner to have sufficient experience in the insurance business; that person must apply for a surplus lines coverage license, pay a licensing fee, and obtain a bond. § 27-10-24. A surplus lines broker has certain duties he or she must comply with before issuing surplus lines coverage, including ascertaining the financial soundness of the unauthorized insurance company. *Dutton v. Chester F. Raines Agency, Inc.*, 475 So.2d 545 (Ala. 1985); § 27-10-26.

On May 5, 1988, a Youngblood truck was involved in a collision with an automobile; the occupant in the automobile, Christine Wiley, was killed. Subsequently, Myrtle Beach used its in-house adjusting service, Beach Claim Services, to find an adjuster in Alabama. Beach Claim Services contacted Custard, and Custard investigated and adjusted the claim.

In June 1988, Eyer, knowing that the Fiduciary policy was not authorized, contacted McGriff, Seibels & Williams ("McGriff"), a licensed surplus lines broker in Alabama, asking that it pay the surplus lines insurance tax on the Fiduciary liability policy issued to Youngblood. Eyer did not tell McGriff that there had been an accident covered by the policy. Also, Eyer personally paid the surplus lines tax on the policy.

The administrator of Wiley's estate sued Youngblood, alleging wrongful death. Fiduciary and Myrtle Beach were added as real parties in interest, pursuant to Rule 17, Ala.R.Civ.P. Fiduciary retained counsel to defend its position, and Beach Claim Services, acting on behalf of Myrtle Beach, hired counsel to represent Youngblood. The lawsuit resulted in a $750,000 judgment in favor of Wiley's estate. Fiduciary refused to pay the judgment. In 1990, Youngblood sued Fiduciary, Myrtle Beach, Eyer, JYC, and Custard for damages based on Fiduciary's failure to pay its claim under the policy. Custard is the only defendant involved in this appeal.

Youngblood filed a motion for a summary judgment, alleging that Custard had undertaken to investigate and adjust the loss on behalf of Fiduciary, an unauthorized insurance company. Therefore, Youngblood contended, Custard was liable pursuant to § 27-10-2(b). Youngblood also claimed that the Fiduciary policy was not lawfully written as surplus lines insurance coverage pursuant to

3

the statutory provisions regarding "unauthorized insurers and surplus lines," Title 27, Chapter 10, §§ 27-10-1 through -56.

Custard moved for a summary judgment, claiming that it had not been involved in the solicitation, procurement, or negotiation of the Fiduciary policy issued to Youngblood and that it had become involved only after the insurance coverage had been purchased. Custard asserted that § 27-10-2(b) violates the Alabama Constitution. Custard argues that § 27-10-2(b) discriminates against adjusters in an arbitrary, unreasonable, and unnecessary manner and is therefore unconstitutional. Specifically, Custard argues that the statute creates unequal governmental classifications that are not rationally related to any legitimate state purpose. Custard also argues that § 27-10-2 is ambiguous, unduly vague, unreasonable, and overbroad, and therefore violates the right to due process.

The trial court denied Custard's summary judgment motion and granted a partial summary judgment in favor of Youngblood and against Custard. In its order, the trial court held (1) that Youngblood's liability policy with Fiduciary did not qualify as a permissible surplus lines insurance policy, (2) that Custard had undertaken to investigate and adjust the claim on behalf of Fiduciary, and (3) that Youngblood had suffered a loss due to Custard's actions regulated or restricted by § 27-10-2(b). The trial court held that Youngblood was entitled to a judgment as a matter of law on the question of Custard's liability under § 27-10-2(b), with a jury to determine the amount of damages.

*Custard Insurance Adjusters v. Youngblood*, 686 So.2d 211, 213-14 (Ala. 1996).[2]

Ala. Code §27-10-1(a) provides:

No person shall in this state, directly or indirectly, act as agent for, or otherwise represent or aid on behalf of another, any insurer not then authorized to transact such insurance in this state in the solicitation, negotiation or effectuation of insurance or annuity contracts, forwarding of applications, delivery of policies or contracts, inspection of risks, fixing of rates, investigation or adjustment of losses, collection of premiums or in any other manner in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this state.

Ala. Code §§ 27-10-2 (a) and (b) provide:

(a) Any person who in this state willfully represents or aids an unauthorized insurer in violation of Section 27-10-1 shall, in addition to any other applicable penalty, be liable for the full amount of any loss sustained by

---

[2] Myrtle Beach changed its name and relocated to Wyoming.

> or adjustment of any loss arising under a contract of insurance or annuity issued by an unauthorized insurer and covering at time of issuance a subject of insurance resident, located or to be performed in this state shall be liable for the full amount of any loss suffered by the insured under such contract.

The Alabama Supreme Court affirmed the trial court's adjudication that Custard was liable to Youngblood.[3] Custard's liability carrier was Harbor Insurance Company. Continental, the plaintiff in the instant case, acquired Harbor and then satisfied the Wiley judgment. Continental now turns to the instant defendants to make good its losses.

The plaintiff does not seek contribution from these defendants; it seeks to be made whole through indemnity. While acknowledging that indemnity normally is not allowed among joint tortfeasors, the plaintiff states that "Alabama law allows indemnity, as distinct from contribution, where one tortfeasor is guilty of only passive or constructive negligence and the other of active negligence." *Plaintiff's August 25, 1999 Brief*, p. 24. Continental states that Custard's investigation was not the efficient cause of Youngblood's damages, rather its investigation actually assisted Youngblood, and thus it would be inequitable to deny Continental indemnity.

The plaintiff cites *Walter L. Couse & Co. v. Hardy Corp.*, 274 So.2d 316 (Ala.

---

[3]  After the Alabama Supreme Court held that Custard was liable to Youngblood Trucking, JYC&E's motion for summary judgment was granted and it was dismissed from the case, while McGriff, Seibels, & Williams' and JYC's motions for summary judgment were denied. "After the First Coverage Lawsuit was set for trial, Custard, McGriff, JYC, and Eyer agreed to mediate the dispute. Following the mediation, McGriff, JYC, and Eyer entered into a Confidential Settlement Agreement, Release, Waiver, and Covenant Not To Sue with Youngblood." *JYC&E's April 23, 1999 Brief*, pp. 3-4.

cause of Youngblood's damages, rather its investigation actually assisted Youngblood, and thus it would be inequitable to deny Continental indemnity.

The plaintiff cites *Walter L. Couse & Co. v. Hardy Corp.,* 274 So.2d 316 (Ala. Civ. App 1972), *cert. denied,* 274 So.2d 322 (Ala. 1973). In *Couse,* a third person was injured while using a public sidewalk. The contractor sought indemnity from its sub-contractor, pursuant to their written indemnity agreement, which stated:

> The sub-contractor will protect, defend, indemnify and hold harmless Walter L. Couse & Co., from Any damages, claims, liabilities, attorneys' fees or expenses whatsoever, or Any amount paid in compromise thereof arising out of or connected with the performance of this order.

*Couse,* 274 So. 2d at 318. The Court of Appeals held that where the intention to indemnify the negligence of the indemnitee is clear, the indemnity provision should be enforced.

The contractor in *Couse* also asserted that, even without an express agreement, it was due indemnity, because it was the sub-contractor who actually performed the work on the sidewalk and left it in a dangerous condition, while the contractor's negligence, on the other hand, was merely passive. In addressing this contention, the Alabama Court of Civil Appeals discussed Alabama law concerning indemnity among joint tortfeasors:

> [I]ndemnity will not be allowed among joint tortfeasors in Alabama. See *Mallory S.S. Co. v. Druhan,* 17 Ala. App. 365, 84 So. 874. However, an exception to the above is that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed

was the efficient cause of the injury. Where an injury results from a violation of a duty which one owes to another, the parties are not in Pari delicto. *See Mallory*, supra.

The Supreme Court of Alabama has recognized the principle that a master may be indemnified against his servant when the master is liable solely by reason of the negligence of his servant. *See American Southern Ins. Co. v. Dime Taxi Service*, 275 Ala. 51, 151 So. 2d 783. Put another way, the one seeking indemnity has been allowed to do so since its liability to a third person was only vicarious or derivative. Or as appellee states in brief, indemnity between master and servant lies when the master is guilty of no negligence himself other than by the doctrine of respondeat superior.

If appellant here alleged an action for nonexpressed contractual indemnity against his subcontractor and the allegation in the complaint on its face showed contractor to be a joint tort-feasor not coming within the exception previously stated, no action would lie. However, in the instant case appellant alleges its liability results solely from an act of defendant which was imputed to appellant as prime contractor; ie., that his liability to the third person was vicarious or derivative, or that the fault of the subcontractor was the efficient cause of the injury.

Therefore, to this court, if appellant's liability to a third party could arise under the law solely because of the relationship of contractor to subcontractor, much like that of master to servant, then appellant has stated a cause of action.

*Walter L. Couse & Co.*, 274 So. 2d at 320-21. The court further stated that, unlike in master-servant relationships, the general rule in Alabama is that a contractor is not liable to members of the general public for the negligence of its subcontractor, although there are exceptions:

It is the general rule of law in Alabama, unlike that of master and servant, that a contractor is not liable for the negligence of its subcontractor. *See Williams v. Wise*, 255 Ala. 322, 51 So. 2d 1, where the Supreme Court of Alabama stated:

But a contractor is not liable to a member of the public for the negligence of a subcontractor, except (1) that the contractor and his original contractee and his subcontractor are each liable to the public for injuries resulting directly and necessarily from the acts authorized to be done; but this does not extend to injuries which are not a necessary result of the work, but are caused by the negligent act of the subcontractor in doing the work, for then the subcontractor alone is responsible. Another exception to the general rule above stated is (2) where the law imposes on the original contractor a duty to keep the subject of the work in a safe

> condition (such as a city in respect to streets), the duty continues
> throughout its performance. . . . (255 Ala. at 327, 51 So. 2d at 5).

*Id.* at 321.   Thus, a contractor can be held liable to a member of the public for the

negligence of his subcontractor, solely because of a *duty* imposed on the contractor by

*law.*

The plaintiff also cites *First Alabama Bank of South Baldwin v. Prudential Life

Ins. Co. of America*, 619 So.2d 1313 (Ala. 1993).   Continental contends that the facts in

the instant case fall squarely within *Prudential*'s holding.   In *Prudential*, Mr. Badners

purchased a life insurance policy.   The premiums were paid by a "Pru-matic" draft

drawn each month on a particular account the Badners had with First Alabama Bank.

After the Badners divorced, Mr. Badners was required to maintain the life insurance

policy with his former wife as beneficiary.   Mr. Badners closed the account.   Thereafter,

when Prudential sent the draft on the closed account, the bank, with Mr. Badners'

permission, manually changed the account number of the draft to the number of a

funded account; this procedure was used instead of formally changing Mr. Badners'

account number with Prudential on the "Pru-matic" draft.   This procedure was followed

for more than twenty-five months, until, for some unknown reason, the June, 1986

premium draft was not manually changed and was returned to Prudential.   Shortly

thereafter, Mr. Badners died.   Prudential later informed Mr. Badners' former wife that

the June draft had been returned unpaid by First Alabama Bank, and, therefore,

instead of $36,000.00, she was due only $8,092.75 as extended term insurance under the automatic nonforfeiture provision.  After holding that Prudential had waived its right to forfeit the policy because of late premium payments, the court addressed Prudential's cross-claim that First Alabama Bank should indemnify it for its losses, and stated:

> In Alabama, a joint wrongdoer may claim indemnity when he has not been guilty of any fault, except technically or constructively, or where both parties are at fault but the fault of the party from whom indemnity is claimed was the efficient cause of the injury. *See Crigler v. Salac*, 438 So.2d 1375 (Ala.1983).
>> The theory of indemnity holds the defendant liable for the whole damage (joint tortfeasors in pari delicto) flowing from the contract. . . . [I]ndemnity seeks to transfer the entire loss of one tortfeasor to another who, in equity and justice should bear it.
>
> *Sherman Concrete Pipe Machinery, Inc. v. Gadsden Concrete & Metal Pipe Co.*, 335 So.2d 125, 126 (Ala.1976).
> Here, the full amount of the policy (the extended term rider) was not paid because an employee of FAB did not change the account number on Prudential's preauthorized draft (for June 1986), as it had done monthly for over two years, and pay the draft out of an active account. The trial court, sitting without a jury, determined that in equity and fairness FAB should bear the liability for the damages.
>   . . .
> We hold that FAB, through its actions and custom for over two years, created a duty to Prudential to exercise ordinary care to pay the preauthorized drafts presented by Prudential against Mr. Badners' account in a reasonably prudent manner. We find no error in the trial court's entry of the summary judgment in favor of Prudential.
> Likewise, we conclude that the trial court correctly denied FAB's summary judgment motion for indemnity against Prudential. The evidence is undisputed that Prudential followed the same course of conduct that it had followed for over 25 months after the closing of the account against which it was authorized to issue preauthorized drafts. The evidence was undisputed that Prudential's draft in June 1986 was against the closed account. FAB admitted that the check should have been paid and that if Ms. Bruhn, an assistant vice president, had known about the draft in June, it would have been paid. She had no excuse or explanation for FAB's failure to pay the check. Mr. Badners died before the breakdown in the system was corrected. The trial court found that

in equity and good conscious FAB should bear the responsibility for its conduct
and should indemnify Prudential from the damages awarded by the jury.

*Id.* at 1319-20.

Continental also points out that Andy Corneil, Custard's Birmingham branch
manager, and the person who conducted the investigation, did not know at the time of
the investigation that it violated Alabama law. Corneil also stated that if he had
known of § 27-10-2, he would have contacted the Alabama Department of Insurance
before undertaking an investigation.

The defendants assert that indemnity does not apply under the facts of this
case.[4] In *Youngblood*, the Alabama Supreme Court considered Custard's claim that
§ 27-10-2(a) and § 27-10-2 (b) treated insurance adjusters differently from agents and
brokers, in violation of Custard's equal protection rights. The court held that this
statute did not impose a stricter standard on adjusters, and that, even if it did,
adjusters' equal protection rights are not violated thereby. The court stated:

Section 27-10-2(a) sets out two types of conduct for which a person could be
liable, namely, willfully representing an unauthorized insurer *or* aiding an
unauthorized insurer. [FN2] Section 27-10-2(a) deals with conduct that is
willful, but also deals with conduct that aids an unauthorized insurer in
illegally selling insurance in Alabama, whether the aid was rendered willfully
or not.

> FN2. We realize that our interpretation of this phrase, if this
> phrase were being interpreted alone, would contradict general
> rules of grammar. However, viewing the phrase in light of the

---

[4] Any liability of JYC and JYC&E must be predicated upon the liability of Jack Eyer.
If Eyer is not liable, it is unnecessary to address JYC's and JYC&E's arguments against
derivative liability, or to address JYC&E's res judicata and collateral estoppel arguments.
(JYC&E's res judicata and collateral estoppel arguments were not raised at oral argument.)

10

overall legislative purpose of protecting Alabama citizens from
foreign insurance companies operating without authority, we
conclude that placing liability on those who "aid" rather than on
those who "willfully aid," as Custard argues the legislature
should have done, conforms to the overall spirit of the act.
Additionally, applying a "willful" standard to conduct on the part
of agents or brokers and a "no fault" standard to conduct on the
part of adjusters does not violate the right to equal protection, as
is discussed in the next paragraph.

Second, even if the statute imposed a "willful conduct" standard on an
agent or broker and imposed a "no fault" standard of conduct on adjusters, we
would hold that such a standard is rationally related to a legitimate state
interest, specifically the purpose of protecting Alabama citizens from abuses by
unauthorized insurers illegally operating in this state. Custard asks "What
justification exists to penalize the adjuster for providing a policy benefit?" We
think the justification is based on the adjuster's role in the insurance industry.
The reason a person purchases insurance is so that the insurer will pay him for
specified losses under specified perils. An insured person does not have a claim
on an accident insurance policy until an accident occurs. An adjuster's job is to
investigate that claim and determine the amount of damages, and, in return,
the adjuster is paid for his services. To allow adjusters to facilitate the
insurance claims process for unauthorized insurers without some duty on the
adjusters' part to protect Alabama citizens from unauthorized insurers illegally
operating would go against the Legislature's intentions in adopting the
provisions of Chapter 10. A surplus lines broker must file a report with the
insurance commissioner when surplus lines coverage is issued; therefore, it
would be easy for an adjuster to check with the insurance commissioner to see
if the unauthorized insurer has issued surplus lines coverage.

*Custard Insurance Adjusters v. Youngblood*, 686 So.2d at 216.[5]

In *J. C. Bradford & Co. v. Calhoun*, 612 So.2d 396 (Ala. 1992), John Calhoun,

as guardian of money belonging to his son, sought the advice of Tom Fowler, who at the

time was working for J. C. Bradford.  Calhoun asserted that Fowler knew that he was

acting in a guardianship capacity, and that Fowler assured him that the investments

---

[5] In his lone dissent, Justice Cook stated that both sections should be construed as
containing a willfulness requirement.

11

were safe and would make a great deal of money.  After the investments resulted in

losses, a court determined that Calhoun had breached his fiduciary duty as a guardian,

and ordered him to make up the losses.  Calhoun then sued J.C. Bradford for

reimbursement.  His claim was rejected.  The court stated:

> J. C. Bradford also argues that Calhoun should not be allowed to indemnify himself against losses he was required to repay his son's guardianship estate, because, J. C. Bradford argues, Calhoun was a joint tort-feasor.
>> The general rule in Alabama, subject to exceptions, is that joint tort-feasors are not entitled to indemnity or contribution. *Parker v. Mauldin*, 353 So.2d 1375 (Ala. 1977).
>
> *Crigler v. Salac*, 438 So.2d 1375, 1385 (Ala. 1983).  We do recognize some exceptions to that rule:
>> Some exceptions to the rule that indemnity will not be allowed among joint wrongdoers are that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the proximate or primary cause of the injury. *Mallory S.S. Co. v. Druhan*, 17 Ala. App. 365, 84 So. 874 (1920). See 42 C.J.S. Indemnity § 27 (1944)."
>
> *Crigler*, supra, at 1385.  Bradford contends that Calhoun's duties as guardian were nondelegable and, therefore, that he cannot now pass to his broker the neglect of his responsibilities.
>> While a guardian may not delegate his authority and duties to others, he must frequently act through agents or attorneys. This is not a delegation of his powers, for the guardian remains responsible for the reasonable diligence of his agent or attorney. He must select his agents or attorney with reasonable care, and he must supervise their acts with the same degree of care. *Donaldson v. Allen*, 182 Mo. 626, 650, 81 S.W. 1151; *McClure v. Middletown Trust Co.*, 95 Conn. 148, 110 A. 838. Whether in a given case the guardian will be justified in intrusting a specific part of the administration of the trust to an agent must depend upon whether such act would be the act of a reasonably prudent person in a similar situation."
>
> *Cox v. Williams*, 241 Ala. 427, 3 So.2d 129, 133 (1941). Section 19-3- 120 et seq., Code of Alabama (1975), set out the investments into which a guardian may invest the proceeds of a guardianship estate. We do not deem the failure of a guardian to apprise himself of his legal responsibilities with regard to investing a guardianship estate to be within the realm of "technical fault" or "constructive fault."  In addition, Calhoun evidently never consulted anyone with regard to

12

his specific duties with regard to his son's money. He commingled his own money with guardianship funds and he failed to provide the court with a timely accounting, both of which are violations of his duties as a guardian.

*J. C. Bradford & Co.*, 612 So. 2d at 398.

The undersigned is of the opinion that *J. C. Bradford & Co. v. Calhoun* and the *Youngblood* case are more analogous to the set of facts now before the court than the cases cited by the plaintiff. Jack Eyer's analysis seems incisive:

> Joint tort-feasors are two or more parties whose act or acts contribute in causing injury. No reasonable construction of the facts in this case can align Custard and Jack Eyer as joint tort-feasors. As the Plaintiff argues, it is true that Custard did not play any role in procuring insurance for the *Youngblood* plaintiff. It is true that Custard was only involved in the *Youngblood* case because Custard investigated the facts of the motor vehicle accident which resulted in the lawsuit against the *Youngblood* plaintiff. It is true that nothing Custard did was the proximate cause of the *Youngblood* plaintiff's damages. In view of these facts, Custard's conduct cannot have contributed in any way to the *Youngblood* plaintiff's damages. As a result, Custard is not a joint tort-feasor of anyone, including Jack Eyer. Accordingly, the principles relied upon by the Plaintiff with respect to indemnify among joint tort-feasors are wholly inapplicable.

*Jack Eyer's January 3, 2000 Brief*, p.16. Custard was held not liable in *Youngblood* because the wrongdoings of others were imputed to it; Custard violated its own statutory duty not to investigate. The Alabama legislature created this duty not to investigate as a part of its plan to protect the citizens of Alabama from insurance companies who are not authorized to issue policies in Alabama. As the *Youngblood* court explained, "[t]o allow adjusters to facilitate the insurance claims process for unauthorized insurers without some duty on the adjusters' part to protect Alabama citizens from unauthorized insurers illegally operating would go against the

13

Legislature's intentions in adopting the provisions of Chapter 10." Thus, Continental is not entitled to indemnity.

Wherefore, the plaintiff's motion for summary judgment is due to be denied, while the defendants' motions for summary judgment are due to be granted and this lawsuit dismissed.  An appropriate order will be entered.

Done this $\underline{8th}$ day of June, 2000.

Robert R. Armstrong, Jr.
United States Magistrate Judge

14